## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## BALTIMORE DIVISION

| | |
|---|---|
| **ALLEGIS GROUP, INC., AEROTEK, INC. and TEKSYSTEMS, INC.,** | |
| **Plaintiffs,** | |
| **v.** | |
| **JUSTIN JORDAN, DANIEL CURRAN, ANA NETO RODRIGUES, ALEXANDER FERRELLO, MICHAEL NICHOLAS and CHRIS HADLEY,** | **Case No: 1:12-cv-02535-JKB** |
| **Defendants.** | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants Justin Jordan ("Mr. Jordan"), Daniel Curran ("Mr. Curran"), Ana Neto Rodrigues ("Ms. Rodrigues"), Alexander Ferrello ("Mr. Ferrello"), Michael Nicholas ("Mr. Nicholas"), and Chris Hadley ("Mr. Hadley") (collectively, the "Defendants"), by and through their undersigned counsel, respectfully file this Memorandum of Law in Support of their Motion for Partial Summary Judgment on Count I against Messrs. Jordan, Curran and Hadley, Counts V and VI against Mr. Ferrello, and Count VI by TEKsystems, Inc. ("TEKsystems") against Mr. Hadley and Ms. Rodrigues.

These claims fail as a matter of law. First, the employment agreements of Messrs. Jordan, Curran and Hadley are unenforceable as a matter of law because they are overly broad and the restrictions are not narrowly construed to safeguard Aerotek, Inc.'s ("Aerotek") protectable business interests. Second, there is no evidence that Mr. Ferrello breached his duty of loyalty to Aerotek or that he was in possession of or misappropriated <u>any</u> Aerotek or TEKsystems information upon his departure from Aerotek. Finally, TEKsystems' claim for

misappropriation of trade secrets against Mr. Hadley or Ms. Rodrigues fails because there is not a shred of evidence in the record that either individual took or has possession of any of TEKsystems' confidential information.

## UNDISPUTED FACTS

### I.     PLAINTIFFS' BUSINESSES.

Allegis Group, Inc. ("Allegis Group") is the largest privately held staffing company in the United States and is made up of several wholly-owned subsidiaries, including TEKsystems and Aerotek.[1/]   TEKsystems is one of the largest providers of information technology support and applications and network staffing services, providing more than 80,000 technical professionals per year to support IT engagements at more than 6,000 client sites across North America, Europe and Asia, including 82 percent of the Fortune 500 companies.[2/]   Aerotek, another Allegis Group subsidiary, is one of the world's largest commercial staffing companies. Aerotek provides technical, professional, and industrial recruiting and staffing across a range of industries, including architecture, automotive, construction, energy, engineering, environmental, aerospace and defense, aviation, scientific, clinical research, administrative, accounting and finance, call centers, mortgage, and labor and manufacturing.[3/]

### II.    MR. JORDAN'S RESIGNATION AND FORMATION OF HIS COMPANIES.

Defendants are all former Aerotek employees who executed individual employment agreements during their respective tenures with Aerotek.  Mr. Jordan began working for Aerotek

---

[1/]     *See* ALLEGIS GROUP: STAFFING SERVICES, http://www.allegisgroup.com/Staffing-Solutions/Staffing-Services/default.aspx (last visited December 1, 2013).

[2/]     *See* TEKSYSTEMS: WHY TEKSYSTEMS, http://www.teksystems.com/about-us/why-teksystems (last visited December 4, 2013).

[3/]     *See* AEROTEK: A STAFFING INDUSTRY LEADER, http://www.aerotek.com/about-aerotek/staffing-industries.aspx (last visited December 4, 2013).

as a recruiter in its San Diego, California office in summer 1996. (Jordan Aff. at ¶ 6.)[4/]  On May

19, 2004, when Mr. Jordan was a Director of Business Operations ("DBO") for Aerotek offices

in Virginia and Maryland, he executed an employment agreement that contained certain

restrictive covenants (the "DBO Agreement".)[5/]  The DBO Agreement restricted Mr. Jordan

from:

(1) Competing or being employed by a business that is competing with any aspect of
Aerotek's business (defined to include TEKsystems) for which the employee worked
during the two (2) year period preceding termination of the employee's employment,
in any state of the United States or province of Canada where Aerotek is conducting
business during the employee's employment;

(2) Approaching, contacting or soliciting any entity that was a customer of Aerotek
during the two (2) year period preceding termination of the employee's employment
for the purposes of (i) entering into a business relationship that is competitive with
any aspect of Aerotek's business (defined to include TEKsystems) for which the
employee performed services during the two (2) year period preceding termination of
the employee's employment, or (ii) reducing or eliminating the business such
customer conducts with Aerotek (defined to include TEKsystems);

(3) Soliciting any regular Aerotek employee to (i) provide services to an entity whose
business is competitive with Aerotek, or (ii) leave the employ of Aerotek; and

(4) Using, disclosing or divulging any of Aerotek's Confidential Information (defined to
include TEKsystems and as information that is not generally known by competitors or
the general public concerning Aerotek's business that Aerotek takes reasonable
measures to keep secret).

(DBO Agreement, at pp. 2-4.)  Aerotek specifically alleges that "As a Director of Business

Operations, [Mr. Jordan]'s non-compete provision was geographically broader, including *any*

*state of the United States or province of Canada* where Aerotek conducted business during the

term of his employment with Aerotek."  (Compl. at ¶ 62, FN 3) (emphasis added.)

Following the execution of this agreement, Mr. Jordan was promoted in March 2006 to

---

[4/]      The Affidavit of Justin Jordan ("Jordan Aff.") is attached hereto as Exhibit 1.
[5/]      A true and accurate copy of Mr. Jordan's May 19, 2004 employment agreement is attached hereto at
Exhibit 2.

Vice President of Vertical Sales and again in approximately late fall 2008 to Regional Vice President of the Mid-Atlantic Region.  (Jordan Aff. at ¶¶ 10-12.)  On or around February 20, 2009, Mr. Jordan resigned from his employment at Aerotek to care for his wife, who had undergone two heart surgeries in a five-week period, and his children.  (*Id*. at ¶¶ 13-16.) Following his resignation, Mr. Jordan decided that he wanted to start his own business and took some preliminary steps for doing so. (*Id*. at ¶¶ 17-18.) The restrictive covenants in Mr. Jordan's DBO Agreement expired on February 20, 2011.  (DBO Agreement, at pp. 1-3.)

In January 2011, Mr. Jordan's first company, Zachary Piper, began business when its Tysons Corner, Virginia office opened.  (Jordan Aff. at ¶ 20.)  Zachary Piper booked its first revenue in February 2011.  (*Id*.)  Piper Enterprise Solutions North Carolina, LLC, Mr. Jordan's other company, was formed on September 13, 2011.[6/]  The Durham, North Carolina office opened on October 31, 2011.  (Jordan Aff. at ¶ 21.)  Piper Enterprise Solutions, LLC (together with Piper Enterprise Solutions North Carolina, LLC, "Piper Enterprise Solutions") was formed on August 22, 2011, and shares office space with Zachary Piper in Tysons Corner, Virginia.  (*Id*. at ¶ 22.)

Zachary Piper is a Small Business Concern focused on three key areas: Intelligence Analysis & Support, Information Technology & Communications, and Cyber Solutions.[7/] Zachary Piper operates in a narrow, specialized market, providing defense and intelligence solutions to the Intelligence Community.  (*See id*.)  Zachary Piper's billable employees generally possess a Top Secret/Sensitive Compartmentalized Information ("TS/SCI") clearance or Full Scope Polygraph Clearance.  Piper Enterprise Solutions is a niche IT recruiting firm focused on

---

[6/]    A copy of the Articles of Organization for Piper Enterprise Solutions, which were filed with the North Carolina Department of the Secretary of State, marked JJ12503 - 12505, are attached hereto at <u>Exhibit 3</u>.

[7/]    *See* ZACHARY PIPER - ABOUT, http://www.zacharypiper.com/about.html (last visited December 4, 2013).

staffing within IT infrastructure, software development, and IT systems engineering.[8/]   The company provides comprehensive technology solutions and strategic consulting services, with a specialization in technology management, project management, application development, and IT infrastructure and communications support services. (*See id.*)

## III.   THE REMAINING DEFENDANTS' EMPLOYMENT AGREEMENTS.

It is undisputed that Messrs. Curran, Nicholas, Ferrello and Hadley and Ms. Rodrigues worked only for Aerotek, never TEKsystems. (Amended Complaint ("Compl.") at ¶ 11.  These individuals executed employment agreements with Aerotek (the "Employment Agreements") on the following dates:

- Mr. Curran: July 24, 2009
- Mr. Hadley: July 24, 2009
- Ms. Rodrigues: July 12, 2010
- Mr. Ferrello: July 12, 2010
- Mr. Nicholas: July 12, 2010

The Employment Agreements contained the following restrictive covenants:

(1) An 18-month non-competition clause prohibiting the employee from competing or being **employed by a business that is competing with any aspect of Aerotek's business for which the employee performed services or about which the employee obtained Confidential Information during the two (2) year period preceding termination of the employee's employment**;

(2)  An 18-month non-solicitation clause prohibiting the employee from communicating with any customer of Aerotek's about which the employee obtained Confidential Information or with which Employee did business on Aerotek's  behalf during the two (2) year period preceding termination of the employee's employment for the purposes of (i) entering into a business relationship that is competitive with any aspect of Aerotek's business for which the employee performed services or about which the employee obtained Confidential Information during the two (2) year period preceding termination of the employee's employment, or (ii) reducing or eliminating the business such customer conducts with Aerotek;

(3) An 18-month non-solicitation clause prohibiting the employee from communicating

---

[8/]   *See* PIPER ENTERPRISE SOLUTIONS, http://www.piperes.com/ (last visited December 1, 2013).

with any person who has been a regular Aerotek employee within the two (2) year period preceding termination of the employee's employment and about whom the employee obtained knowledge or had contact with by reason of the employee's employment with Aerotek for the purpose of (i) providing services to an entity whose business is competitive with Aerotek, or (ii) leaving the employ of Aerotek;

(4) A confidentiality clause prohibiting the employee from using, disclosing or divulging any Confidential Information (defined therein as information not generally known by competitors of Aerotek or the general public concerning Aerotek's business that Aerotek takes reasonable measures to keep secret); and

(5) A clause prohibiting the employee from engaging in any conflicting business activities during the term of the Agreement.[9]

With respect to Messrs. Curran and Hadley's agreements, Aerotek alleges that they had nation-wide responsibilities and, therefore, implies that they are prohibited from competing anywhere in the United States.  (Compl. at ¶ 62-63, FN 4.)

Mr. Curran resigned his employment with Aerotek on September 16, 2011.  (Compl. at ¶ 11.)  Mr. Nicholas resigned from Aerotek on January 3, 2012.  (*Id.*)  Mr. Hadley resigned from Aerotek on April 6, 2012.  (*Id.*)  Ms. Rodrigues and Mr. Ferrello both resigned from Aerotek on March 30, 2012. (*Id.*)   More specifically, Mr. Ferrello resigned because shortly after Ms. Rodrigues resigned, Mr. Ferrello's supervisor, Chris Matthews, and Burt Baptiste, the Regional Vice President for the Mid-Atlantic region, confronted Mr. Ferrello.  (Ferrello Aff. at ¶ 14.)[10] They told him that Aerotek was suing Messrs. Jordan, Nicholas and Curran and Ms. Rodrigues and that Mr. Ferrello should be careful so that he did not get sued as well.  (*Id*. at ¶ 15.)  Mr. Ferrello honestly responded to their questions that he had been contacted by Mr. Jordan about employment, had not been solicited by anyone else, and had not had any conversations with Mr. Jordan about Aerotek's business.  (*Id.*)  Subject to these threats and without having a final offer

---

[9]      Copies of these Employment Agreements are attached hereto, in the order the Defendants are named in the pleading, at <u>Exhibit 4</u>.
[10]      The Affidavit of Alexander Ferrello ("Ferrello Aff.") is attached hereto as <u>Exhibit 5</u>.

of employment from Mr. Jordan, Mr. Ferrello left the Aerotek office and contacted Mr. Jordan who offered to finalize an employment agreement that day if Mr. Ferrello wanted to leave Aerotek.  (*Id*. at ¶¶ 16-17.)   Mr. Ferrello did so, returned to the office, submitted his resignation, and left the office without any Aerotek or TEKsystems documents or information. (*Id*. at ¶¶ 18-19.)

All of the individuals resigned in order to work for Piper Enterprise Solutions (Mr. Ferrello and Ms. Rodrigues in Northern Virginia and Messrs. Curran, Nicholas and Hadley in North Carolina).  (Jordan Aff. at ¶ 24.)  Each of these individuals is working in the IT staffing line of business, which none of them supported at Aerotek.  (*Id*.) While some of the employees work under the "Zachary Piper" umbrella for certain clients (if the work is for a government contractor or if the entity is already familiar with the Zachary Piper brand), the Former Employees do not staff any work outside of the IT arena.  (*Id*. at ¶ 25.)

## IV.   TEKSYSTEMS' CONFIDENTIAL INFORMATION

In the Complaint, Plaintiffs allege that Defendants had access to TEKsystems confidential information and trade secrets.  (Compl. at ¶¶ 24-25; 29, 33, 63.)   In their Responses to Defendants' First Set of Interrogatories, Plaintiffs identify three "confidential" TEKsystems documents that are in Defendants' possession – a CAT 2 Price Sheet, a TEKsystems' Staffing Services Agreement, and a 2005 internal memorandum discussing Aerotek's and TEKsystems' respective markets (the "Market Definitions Memo").[11]   (Interrog. Resp. at p. 5.)   Despite Defendants producing more than 13,000 pages of documents and conducting a forensic review of several electronic devices from Mr. Hadley and Ms. Rodrigues, these are the only TEKsystems documents that Plaintiffs have identified.  There is no evidence that Mr. Ferrello, Mr. Hadley or

---

[11]     A true and accurate copy of Plaintiffs' Responses to Defendants' First Set of Interrogatories is attached hereto at <u>Exhibit 6</u>.

Ms. Rodrigues ever had possession or knowledge of these documents and no evidence that any of these individuals took any TEKsystems documents or information with him or her upon resigning from Aerotek.   Moreover, the CATS 2 Price Sheet is publicly available on the Maryland Department of Information Technology website to anyone with internet access.[12]   A Staffing Services Agreement with nearly identical language to the one in question is available on the State of Connecticut website.[13]   And, the thrust of the information contained in the Market Definitions Memo, which summarizes the delineation of TEKsystems' and Aerotek's work in the software market, is easily engineered through Google searches on the two companies and the types of placements that they make on a routine basis.  (Jordan Aff. at ¶ 27.)

## APPLICABLE LEGAL STANDARD

"Summary judgment is appropriate 'when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Stanley v. Huntington Nat'l Bank*, 492 Fed. Appx. 456, 459 (4th Cir. 2012) (citing Fed. R. Civ. P. 56(c)).   The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Sibley v. Lutheran Hospital of Maryland, Inc.*, 871 F.2d 479, 483 (4th Cir. 1989) (internal citation omitted).

In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to the party opposing the motion."  *Charbonnages de Fr. v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979).   However, Rule 56 mandates summary judgment against a party who, after adequate time for discovery "fails to make a showing sufficient to establish the

---

[12]   *See*   http://doit.maryland.gov/contracts/Documents/catsII_laborrates/TEKsystemsInc.pdf   (last   visited December 5, 2013).
[13]   *See* http://www.ct.gov/hix/lib/hix/TEK.pdf (last visited December 5, 2013).

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006). The nonmoving party cannot "create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

I.     **THE BREACH OF EMPLOYMENT CONTRACT CLAIMS AGAINST MESSRS. JORDAN, CURRAN AND HADLEY FAIL AS A MATTER OF LAW BECAUSE THE CONTRACTS ARE OVERLY BROAD.**

A.     **Mr. Jordan's Non-Competition Clause is Overly Broad and Unenforceable.**

"The general rule in Maryland is that… an employee's agreement not to compete with his employer upon leaving the employment will be upheld 'if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public.'" *Hebb v. Stump, Harvey & Cook, Inc.*, 25 Md. App. 478 (1974) (quoting *Ruhl v. Bartlett Tree Co.*, 245 Md. 118, 123-124 (1967)); *MacIntosh v. Brunswick*, 241 Md. 24 (1965). In determining whether the scope of any limitation is reasonable, the courts focus their inquiry on the relevant market of the employer. *See Nat'l Instrument v. Braithwaite*, 2006 Md. Cir. Ct. LEXIS 12 (holding that a global liquid filling systems company enforced a reasonable restriction by not allowing the employee to work for a competitor in North America for two years, because it was a highly specialized field with only 18 competitors in all of North America). Here, Aerotek's protectable interest is limited because there are approximately 17,000

staffing companies that generate approximately $117 billion in sales in the United States.[14/]

The restrictive covenants in Mr. Jordan's employment agreement are unreasonably broad. In fact, they were so broad, that Aerotek revised the agreement to exclude TEKsystems in the other Defendants' Employment Agreements, which were signed years later.  (*See* Employment Agreements at Ex. 4.)   The non-competition provision extends to any aspect of "Aerotek's Business" in which employee performed work during the two (2) year period preceding his termination across the country and Canada, despite the fact that Mr. Jordan worked almost exclusively in the Mid-Atlantic region during the last two years of his employment.   Aerotek's Business is defined to include TEKsystems, a company for which Mr. Jordan never worked, a vast array of recruiting and staffing services, and any other lines of business that Aerotek "prepare[d] to enter" during Mr. Jordan's employment.   Notably, in the last two years of his employment, Mr. Jordan did not interface with clients and oversaw a number of employees working in a variety of industries.

The non-competition provision, therefore, extends well beyond Aerotek's protectable interest and is not reasonably tailored.  Because of the broad definition of Aerotek's Business, the nature of Mr. Jordan's work at Aerotek, and the fact that Aerotek is a multi-billion dollar company that is constantly expanding the services it offers, the DBO Agreement casts as wide a net possible to prevent ordinary competition -- even in markets in which it may not have been active at the time of the execution of the employment agreement.   This type of restriction inevitably imposes undue hardship on Mr. Jordan and disregards the public interest in his right to a livelihood.  *Becker v. Bailey*, 268 Md. 93, 99-101 (1973).   On its face, the non-competition agreement is overly broad and unenforceable.

---

[14/]   AMERICAN   STAFFING   ASSOCIATION   –   DATA   &   RESEARCH
http://www.americanstaffing.net/statistics/faqs.cfm (last visited December 4, 2013).

**B.      Mr. Jordan's Non-Solicitation Clause is Similarly Overly Broad and Unenforceable.**

Mr. Jordan's non-solicitation covenant prevents him from having contact with **any** Aerotek clients or employees regardless of whether he worked with the clients or employees during his time at Aerotek.    This Court has held such a "blanket" prohibition is overbroad and unenforceable under Maryland law.  *Deutsche Post Global Mail, Ltd. v. Conrad*, 292 F. Supp. 2d 748, 755-56 (D. Md. 2003) (*aff'd*, 116 Fed. Appx. 435).   In *DPGM v. Conrad*, the court invalidated the restrictive covenants in the salespersons' contracts because the scope was not limited to those clients with which the salespersons had interacted, noting that Maryland courts had "expressed concerns about the impositions of such blanket restrictions on client solicitation." *DPGM v. Conrad*, 292 F. Supp. 2d at 755 (citing *PADCO Advisors, Inc.*, 179 F.Supp.2d at 608) ("Maryland has looked with disfavor on agreements which restrict former employees from dealing with all former clients"). Again, Mr. Jordan had little to no contact with customers during the final years of his employment with Aerotek, and, therefore, the non-solicitation is not tailored to protect Aerotek's customer goodwill.  Accordingly, the provision is unenforceable.

**C.      To the Extent Aerotek Attempts to Enforce a Nationwide Non-Competition Provision Against Messrs. Curran and Hadley, the Provision Would be Overly Broad and Unenforceable.**

The Complaint implies that Aerotek may attempt to enforce a nationwide non-competition agreement against Messrs. Curran and Hadley based on the fact that they both worked in National Sales at Aerotek.  To the extent Aerotek construes the contract as prohibiting Messrs. Hadley and Curran from working in the staffing industry anywhere in the United States, such a provision is overly broad and not tailored to protect any legitimate business interest.   The limitation must be aimed at preventing Messrs. Curran and Hadley from trading on the goodwill they generated at Aerotek, not a blanket provision against staffing anywhere that Aerotek has an

office (which is, essentially, nationwide).  *See Deutsche Post Global Mail, Ltd. v. Conrad*, 116 Fed. Appx. 435, 438 (4th Cir. 2004) (holding that the restrictive covenant was "much broader than [wa]s reasonably necessary" to protect the former employer's interest because it was not "specifically targeted at preventing [defendants] from trading on the goodwill" of the former employer and "seem[ed] designed to prevent any kind of competition by [defendants], which is not a legally protected interest under Maryland law.") (citing *Silver v. Goldberger*, 231 Md. 1, 6 (Md. 1963)) (unpublished opinion).

**D.**     **The Restrictive Covenants Cannot be Saved by Blue Penciling**.

Aerotek should not be rewarded for drafting overly broad restrictive covenants by putting the onus on the Court to rewrite them into enforceability.  Maryland law allows courts to strike offending contractual language of overbroad covenants where such an action would *not* require the supplementation or rearrangement of any language. *Fowler v. Printers II*, 89 Md. App. 448, 465-66 (1991).

This Court reaffirmed *Fowler v. Printers II* in 2003, declaring that blue penciling must be limited to the removal of offending language and cannot include the addition of words or phrases in an effort to make the restrictive covenant reasonable.  *DPGM v. Conrad*, 292 F. Supp. 2d  at 757-58.   The restrictive covenants in Messrs. Jordan, Curran and Hadley's employment agreements were purposefully drafted, by a multi-billion dollar company, as broadly as possible. They are not easily divisible.  Aerotek is attempting to use a job title to impose a national non-competition restriction on Messrs. Curran and Hadley without any regard for their actual duties and the company's legitimate business interests.  Furthermore, Mr. Jordan signed the agreement nearly five (5) years before he resigned.  During those years, Aerotek revised their employment agreements, but chose not to have Mr. Jordan sign a more reasonably-tailored version.

Consequently, this Court should not be forced to rewrite the language of these covenants, or impose new restrictions, so as to make them suitably tailored to protect Aerotek's business. *Id.* at 754, FN 3 ("…to permit blue penciling encourages an employer to impose an overly broad restrictive covenant, knowing that if the covenant is challenged by an employee the only consequence suffered by the employer will be to have a court write a narrower restriction for it. This appears…to be extremely unfair and contrary to sound public policy.").

## II.   PLAINTIFFS HAVE NO EVIDENCE TO SUPPORT THEIR MISAPPROPRIATION OF TRADE SECRETS AND BREACH OF THE DUTY OF LOYALTY CLAIMS AGAINST MR. FERRELLO.

### A.   The Misappropriation of Trade Secrets Claim Against Mr. Ferrello Fails As a Matter of Law.

TEKsystems has not identified a single trade secret in Mr. Ferrello's possession. The Maryland Uniform Trade Secrets Act defines a trade secret as: "information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Md. Code Ann., Com. Law § 11-1201(e).[15]

Under the statute, "misappropriation" means the:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know

_____

[15]     The Restatement of Torts sets forth six factors relevant to determining whether given information constitutes a trade secret: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 661 (4th Cir. 1993). (quoting Restatement (First) of Torts § 757). Maryland courts consider the Restatement factors to provide "helpful guidance to determine whether the information in a given case constitutes 'trade secrets' within the definition of [MUTSA]." *Optic Graphics, Inc. v. Agee*, 87 Md. App. 770, 784 (Md. Ct. Spec. App. 1991).

that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (i)    Used improper means to acquire knowledge of the trade secret; or

    (ii)    At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

        1.   Derived from or through a person who had utilized improper means to acquire it;
        2.   Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
        3.   Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (iii)   Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id*. at § 11-1201(c).  Essentially, the Maryland misappropriation statute describes "two general types of misappropriation: (1) acquisition of a trade secret by improper means or (2) disclosure of a trade secret."  *See LeJeune v. Coin Acceptors, Inc.*, 381 Md. 288, 312 (2004).

Here, there is no evidence whatsoever that Mr. Ferrello has acquired any of Aerotek's or TEKsystems' confidential information or trade secrets.  After producing several thousand pages of documents and communications and two depositions, Plaintiffs have no evidence of even a single document that Mr. Ferrello has that would constitute a trade secret.  Moreover, the three documents that Plaintiffs broadly allege are in "Defendants'" possession do not constitute trade secrets because they are either publicly available or easily reverse engineered based on publicly available information.  *See Bond v. Polycycle, Inc.*, 127 Md. App. 365 (1998) (holding that the trade secret law does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its

development or manufacture) (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475-76 (1974); *see also Diamond v. T. Rowe Price Assocs.*, 852 F. Supp. 372 (D. Md. 1994) (holding that papers that were publicly available such as SEC filings were not trade secrets).  After several months of discovery, and with no evidence to support the claim, Aerotek's and TEKsystems' misappropriation claim against Mr. Ferrello fail as a matter of law.

> **B. The Record Clearly Establishes that Mr. Ferrello Did Not Breach His Duty of Loyalty to Aerotek.**

While the duty of loyalty requires that the employee "refrain from actively and directly competing with his employer," some latitude is given to the employee in making arrangements for future employment.  *Weichert Co. of Md. v. Faust*, 419 Md. 306 318 (citing *Maryland Metals, Inc. v. Metzner, et al.*, 282 Md. 31, 38, (1978).  The only allegations against Mr. Ferrello regarding his employment at Aerotek are that he was actively considering leaving to work for Mr. Jordan while still employed.  Such actions, however, are not a breach of the duty of loyalty. For example, in *Maryland Metals*, the Court held that the employee's failure to disclose to the employer his intention to leave and become a competitor was not a breach of his duty of loyalty (stating that courts have been receptive to the view that every person has or at least ought to have the right to ameliorate his socioeconomic status by exercising a maximum degree of personal freedom in choosing employment) (citing *Travenol Laboratories, Inc. v. Turner*, 30 N.C. App. 686 (1976).  *See also Keiser v. Walsh*, 118 F.2d 13 (D.C. Cir. 1941) ("An agent need not wait until he is on the street before he looks for other work.")

**III.   TEKSYSTEMS' MISAPPROPRIATION CLAIMS AGAINST MR. HADLEY AND MS. RODRIGUES HAVE NO FACTUAL SUPPORT, AND TEKSYSTEMS SHOULD BE DISMISSED FROM THIS CASE ENTIRELY.**

For the sole reason of attempting to bolster the claim that Defendants are engaged in unfair, competitive activities, TEKsystems is a Plaintiff to this lawsuit.  TEKsystems' only

claim, however, in this case is the fatally flawed misappropriation claim.  For the same reasons that TEKsystems' claim against Mr. Ferrello fails, the claim of misappropriation against Mr. Hadley and Ms. Rodrigues fails.  Indeed, Mr. Hadley and Ms. Rodrigues submitted for forensic review several electronic devices that they had used during the regular course of business at Aerotek.  A thorough review of those devices revealed that neither individual has a single TEKsystems document.  Furthermore, Defendants have produced thousands of pages of communications between Mr. Jordan and Mr. Hadley and Ms. Rodrigues, none of which indicate that any of TEKsystems' confidential information was taken.  TEKsystems can rely solely on three documents to support this claim: (1) the CAT pricing sheet, which is publicly available online; (2) the Staffing Services Agreement, a nearly identical copy of which is available online; and (3) the Market Definitions Memo, which could easily be recreated based on public information regarding the nature of services and types of positions staffed by TEKsystems and Aerotek in the software industry.  *See Bond*, 127 Md. App. 365.  None of these documents qualifies as a trade secret because they are generally known to the public or could be reverse engineered.  Moreover, there is no allegation that any of those documents were ever in Mr. Hadley's or Ms. Rodrigues' possession.  Because the record is clear that neither Mr. Hadley nor Ms. Rodrigues is in possession of any TEKsystems trade secrets, TEKsystems cannot establish that Mr. Hadley or Ms. Rodrigues misappropriated any such documents or information.   For these reasons, TEKsystems should be dismissed from this case entirely.

## **CONCLUSION**

For the foregoing reasons, Defendants Justin Jordan, Daniel Curran , Cristina Rodrigues, Alexander Ferrello, Michael Nicholas and Chris Hadley respectfully request that this Court

dismiss Count I against Messrs. Jordan, Curran and Hadley, Counts V and VI against Mr.

Ferrello, and Count VI by TEKsystems against Mr. Hadley and Ms. Rodrigues.

Respectfully submitted,

JUSTIN JORDAN, DANIEL CURRAN,
ANA NETO RODRIGUES, ALEXANDER
FERRELLO, MICHAEL NICHOLAS
and CHRIS HADLEY

By their attorneys:


_____/s/_____

Donald W. Schroeder, Esq. (admitted *pro hac vice*)
David Barmak (D. Md. Bar No. 06816)
Jillian M. Collins, Esq. (admitted *pro hac vice*)
MINTZ, LEVIN, COHN, FERRIS
 GLOVSKY AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Phone: (617) 542-6000
Fax: (617) 542-2241
DSchroeder@mintz.com
DBarmak@mintz.com
JCollins@mintz.com


Date: December 6, 2013

17

## <u>NOTICE OF ELECTRONIC FILING</u>

I, Donald W. Schroeder, hereby certify that on December 6, 2013, this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filings (NEF).

/s/
Donald W. Schroeder