IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ALLEGIS GROUP, INC., et al.,          :

    Plaintiffs/Counterclaim           :
    Defendants,
                                      :

v.
                                      :

JUSTIN JORDAN, et al.,
                                      : Civil Action No. GLR-12-2535
    Defendants,
                                      :

v.
                                      :

DANIEL CURRAN, et al.,
                                      :
    Counterclaim Plaintiffs.
                                      :

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants Justin Jordan, Daniel Curran, Ana Neto Rodrigues, Alexander Ferrello, Michael Nicholas, and Chris Hadley's (collectively, "Defendants") Motion for Partial Summary Judgment (ECF No. 74) and Plaintiffs/Counterclaim Defendants Allegis Group, Inc. ("Allegis"), Aerotek, Inc. ("Aerotek"), and TEKsystems, Inc.'s ("TEKsystems") (collectively, "Plaintiffs") Cross-Motion for Partial Summary Judgment (ECF No. 75). This case involves six former Aerotek employees and their activities before and after resigning. The issues before the Court are whether Messrs. Jordan, Curran, and Hadley breached the restrictive covenants in their employment agreements; whether Messrs. Jordan, Curran,

Hadley, and Nicholas breached the restrictive covenants in Allegis's Incentive Investment Plan ("IIP"); whether Mr. Ferrello breached his duty of loyalty to Aerotek; and whether Messrs. Hadley and Ferrello and Ms. Rodrigues misappropriated Aerotek's and TEKsystems's trade secrets in violation of the Maryland Uniform Trade Secrets Act ("MUTSA").

The Court, having reviewed the pleadings and supporting documents, finds no hearing necessary. See Local Rule 105.6 (D.Md. 2011). For the reasons outlined below, the Court will grant in part and deny in part Defendants' Motion for Partial Summary Judgment and grant Plaintiffs' Cross-Motion for Partial Summary Judgment. The restrictive covenants in Mr. Jordan's employment agreement and in Section 9 of the IIP are enforceable as a matter of law. There is no genuine dispute that Mr. Jordan, before his IIP obligations expired, solicited Mr. Hadley to resign from Aerotek. There is no genuine dispute that before their IIP obligations expired, Messrs. Curran, Hadley, and Nicholas staffed Information Technology ("IT") positions in competition with TEKsystems. Plaintiffs proffer no evidence that Mr. Ferrello engaged in conduct that would defeat the privilege to prepare or make arrangements to compete with Aerotek. Finally, Plaintiffs proffer no evidence that the allegedly confidential documents in Defendants' possession are not publicly available or would be valuable to competitors.

## I.    BACKGROUND[1]

Aerotek and TEKsystems are wholly-owned subsidiaries of Allegis that engage in the business of locating, selecting, screening, mobilizing, and placing candidates in temporary and permanent employment positions throughout the United States at all levels of skill and expertise. Aerotek concentrates primarily on satisfying the scientific, software, engineering, and administrative needs of its clients. TEKsystems concentrates primarily on satisfying the information technology needs of its clients. While both companies staff software positions, Aerotek provides staffing for engineering and scientific applications, whereas TEKsystems provides staffing for business and IT applications.

Defendants are former Aerotek employees. Mr. Jordan served as a Regional Vice President until he resigned on February 21, 2009. Mr. Curran served as a National Account Manager ("NAM") and a Director of Strategic Sales ("DSS") until he resigned on September 16, 2011.   Mr. Nicholas also served as a NAM and a DSS until he resigned on January 3, 2012.   Mr. Hadley served as a NAM and a Director of National Sales until he resigned on April 6, 2012.   Ms. Rodrigues served as an Account Recruiting Manager and Senior Account Executive until she resigned on March

---

[1] Unless otherwise noted, the following facts are undisputed and are viewed in the light most favorable to the nonmoving party.

30, 2012.  Finally, Mr. Ferrello served as an Account Recruiting Manager until he resigned on March 30, 2012.  At the time of their resignations, Defendants were working in Aerotek offices in Washington, D.C. and Northern Virginia.

When they began their employment with Aerotek, Defendants executed employment agreements, each of which contain restrictive covenants.  The restrictive covenant in Mr. Jordan's employment agreement is effective for two years and it contains non-competition and non-solicitation provisions.  (See Defs.' Mem. Supp. Mot. Partial Summ. J. ["Defs.' Mot. Partial Summ. J."] Ex. 2 ["Mr. Jordan's Employment Agreement"], at 3-4, ECF No. 74-3).  The non-competition provision prohibits Mr. Jordan from:

> (1) Engag[ing] in, or prepar[ing] to engage in, or be[ing] employed by any business that is engaging in or preparing to engage in, any aspect of AEROTEK's Business in which EMPLOYEE performed work during the two (2) year period preceding his/her termination of employment, in any state of the United States or province of Canada where the Aerotek conducted business during the term of EMPLOYEE's employment, or as much geographic territory as a court of competent jurisdiction deems reasonable[.]

(Id. at 3).  The client non-solicitation provision prohibits Mr. Jordan from:

> (2)   Approach[ing],   contact[ing]   or solicit[ing] any individual, corporation or other entity which, at any time within the two (2) year period prior to the date of

termination of EMPLOYEE's employment, was a client or customer of AEROTEK in an attempt to:

> (a)   enter   into   any   business relationship with a client or customer of   the   Aerotek   if   the   business relationship is   competitive   with   any aspect of AEROTEK's Business in which EMPLOYEE worked during the two (2) year period   preceding   termination   of employment, or
> (b) reduce or eliminate the business such clients or customers conduct with AEROTEK[.]

(<u>Id.</u> at 3-4).  The employee non-solicitation provision prohibits Mr. Jordan from:

> (3)  Solicit[ing]  or  in  any  other  manner attempt[ing]  to  influence  or  induce  any Regular Employee[2] of the Aerotek:
>
> (a)   to   provide   services   to   any individual, corporation or entity whose business is competitive with any of the Aerotek, or
> (b) to leave the employ of any of the Aerotek[.]

(<u>Id.</u> at 4).

---

[2]   Mr.   Jordan's   employment   agreement   defines   "Regular Employee" as "an employee of AEROTEK who is not a 'Contract Employee.'"   (Mr.   Jordan's   Employment   Agreement   at   4).   The agreement defines a "Contract Employee" as "an employee or candidate for employment of any of the Aerotek who is or was employed to perform services at customers or clients of any of the Aerotek."   (<u>Id.</u>).   While the agreement contains a non-solicitation provision that governs solicitation of Contract Employees, Defendants do not challenge that provision.   (<u>See</u> Defs.' Mot. Partial Summ. J. at 3) (omitting summary of the language   in   the   non-solicitation   provision   governing solicitation of Contract Employees).

The non-competition and non-solicitation provisions in Mr. Curran's and Mr. Hadley's employment agreements are similar to the provisions in Mr. Jordan's employment agreement. They are, however, effective for only 18 months and the non-competition provisions only apply within a 100-mile radius from any office in which Messrs. Curran and Hadley worked during their final two years with Aerotek. (See Defs.' Mot. Partial Summ. J. Ex. 4, at 4-7, 55-57, ECF No. 74-5).

The Allegis board of directors selected Messrs. Jordan, Curran, Hadley, and Nicholas to participate in the Allegis IIP. The IIP allows management and other high-level employees to acquire a financial interest in Allegis by promising the employees the equivalent of Allegis stock. The purpose of the IIP is to provide a "select group of management or highly compensated employees . . . an incentive to promote the best interests of the Companies,[3] and . . . an incentive to promote the long term economic growth of the Companies." (IIP at 2). IIP participants are awarded "incentive investment units" ("Units"), which are equivalent to a common share of Allegis stock but do not actually grant equity in Allegis. While employed at Aerotek, participants receive cash dividends twice a

---

[3] The IIP defines "Company" as "Allegis Group" or any subsidiary of Allegis Group" and "Companies" as "all of the foregoing collectively." (Pls.' Mem. Supp. Cross-Mot. Partial Summ. J. & Opp'n Defs.' Mot. Partial Summ. J. ["Pls.' Opp'n"] Ex. 4 ["IIP"], at 2, ECF No. 75-6).

year based on the value of their Units.  In addition, once their employment has ended, Aerotek pays participants the principle balance of the value of their Units, known as "IIP payments," which are distinct from the dividend payments employees receive while employed.  Following the termination of their employment, Aerotek makes IIP payments to participants as follows: five-percent of their balance is paid every quarter for ten quarters, and then the remaining fifty-percent of their balance is paid after thirty months.

Mr. Jordan received all his IIP payments which totaled over $1.45 million.  At the time of their resignations, Mr. Curran was scheduled to receive $196,470 in IIP payments, Mr. Nicholas was scheduled to receive $138,268, and Mr. Hadley was scheduled to receive $498,414.  Mr. Curran, however, only received two payments of $8,851, Mr. Nicholas only received one payment of $6,195, and Mr. Hadley did not receive any IIP payments. Allegis discontinued the IIP payments because it contends Messrs. Curran, Hadley, and Nicholas breached their IIP Award Agreements.

Allegis awards Units through IIP Award Agreements, which employees must sign each time they earn Units.  Messrs. Jordan, Curran, Hadley, and Nicholas all signed IIP Award Agreements. These agreements condition payment upon compliance with Section 9 of the IIP, stating "the terms and conditions set forth in

Section 9 of the [IIP] are material and essential terms of your award of Units and your eligibility to receive payment for any Units." (Pls.' Opp'n Ex. 6, ECF No.75-8). Section 9 is a restrictive covenant that is effective for thirty months after termination of employment. (IIP at 6). Defendants challenge Sections 9(3) and 9(5) of the restrictive covenant. Section 9(3) is an employee non-solicitation provision that prohibits participants from:

> (3) Approach[ing], contact[ing], solicit[ing], or induc[ing] any Regular Employee of the Companies
>
>> (a) to provide services to any individual, corporation or entity whose business is competitive with any of the Companies, or
>> (b) to leave the employ of any of the Companies[.]

(Id.). Section 9(5) is a non-solicitation and non-disclosure provision that prohibits participants from:

> (5) In any way solicit[ing], divert[ing] or tak[ing] away any staff, temporary personnel, trade, business, or good will from the Companies; solicit[ing] accounts or personnel which became known to the Participant through his or her employment with the Companies; influenc[ing] or attempt[ing] to influence any of the Companies customers or personnel not to do business with the Companies; divulg[ing] . . . any information concerning any account of the Companies . . . or disclos[ing] any confidential or proprietary information acquired by the Participant while in the employ of the Companies . . . .

8

(Id. at 6-7).

Mr. Jordan's IIP obligations expired on August 21, 2011, Mr. Curran's on March 17, 2014, and Mr. Nicholas's on June 4, 2014. Mr. Hadley's obligations will expire on October 7, 2014.

After resigning from Aerotek, Mr. Jordan founded the following companies: Zachary Piper, LLC; Zachary Piper, LLC North Carolina; Zachary Piper Holdings, LLC (collectively, "ZP"); Piper Enterprise Solutions, LLC; and Piper Enterprise Solutions North Carolina, LLC (collectively, "PES"). While the parties dispute the work ZP performs, the parties agree PES performs staffing and recruiting in the IT industry.

After resigning from Aerotek, Messrs. Curran, Hadley, Nicholas, and Ferrello, and Ms. Rodrigues took positions with PES. Mr. Curran is Director of Business Development, Mr. Hadley is Vice President of IT Infrastructure and Applications, Mr. Nicholas is Vice President of IT Solutions, and Mr. Ferrello as well as Ms. Rodrigues are Directors. Messrs. Curran, Hadley, and Nicholas are currently performing IT staffing services in or around Raleigh, North Carolina. Mr. Ferrello and Ms. Rodrigues are currently performing IT staffing services in or around Washington, D.C. and Northern Virginia.

Plaintiffs performed a forensic review of several of Defendants' IT hardware devices in order to determine if Defendants, before resigning, removed confidential documents

from Plaintiffs' internal IT networks.  Collectively, Defendants are in possession of the following five documents: (1) a TEKSystems CATS 2 Price Sheet; (2) a Federal Supply Service Price List; (3) a Software Market Definitions Memorandum; (4) an Allegis Group Internal Employee Handbook; and (5) a TEKsystems Staffing Services Agreement.

On July 17, 2012, Plaintiffs filed suit in the Circuit Court for Anne Arundel County, Maryland, alleging breach of employment agreements, breach of IIP Award Agreements, breach of fiduciary duties and duties of loyalty, and misappropriation of confidential information and trade secrets.  (ECF No. 2).  On August 23, 2012, Defendants removed the case to this Court. (ECF No. 1).  On December 19, 2012, Plaintiffs filed an Amended Complaint which adds claims for rescission and unjust enrichment.  (ECF No. 26).

On January 22, 2013, Defendants filed an Amended Counterclaim, alleging breach of contract, violation of the Maryland Wage Act, promissory estoppel, and unjust enrichment/quantum meruit.  (ECF No. 32).  On February 13, 2013, Plaintiffs moved to partially dismiss Defendants' Counterclaim with respect to the Maryland Wage Act (Count II), promissory estoppel (Count III), and unjust enrichment/quantum meruit (Count IV) claims.  (ECF No. 35).  On April 17, 2013, the Court

issued an Order granting Plaintiffs' motion, thereby dismissing Counts II-IV of the Amended Counterclaim.  (ECF No. 45).

Defendants now move the Court to grant summary judgment with respect to the following claims: Allegis's and Aerotek's claim that Messrs. Jordan, Curran, and Hadley breached their employment agreements (Count I of the Amended Complaint); Aerotek's claim that Mr. Ferrello breached his duty of loyalty (Count V of the Amended Complaint); Aerotek's and TEKsystems's claim that Mr. Ferrello misappropriated trade secrets (Count VI of the Amended Complaint); and TEKsystems's claim that Mr. Hadley and Ms. Rodrigues misappropriated trade secrets (Count IV of the Amended Complaint).  (ECF No. 74).  Plaintiffs move the Court to grant summary judgment with respect to whether Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements (Count II of the Amended Complaint and Count I of the Amended Counterclaim).  (ECF No. 75).

## II. DISCUSSION

### A.  <u>Standard of Review</u>

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  A "material fact" is a fact that might affect the outcome of a party's case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>JKC Holding Co. v. Wash.</u>

Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). A "genuine" dispute concerning a material fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmoving party has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

When the parties have filed cross-motions for summary judgment, the court must "review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)) (internal quotation marks omitted). Moreover, "[w]hen considering each individual motion, the court must take care to resolve all

12

factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. (quoting Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996)) (internal quotation marks omitted).

**B.**   **Analysis**

The Court will deny Defendants' Motion for Partial Summary Judgment with respect to Allegis's and Aerotek's claim that Messrs. Jordan, Curran, and Hadley breached their employment agreements (Count I of the Amended Complaint).   The Court will, however, grant the Motion with respect to the following: Aerotek's claim that Mr. Ferrello breached his duty of loyalty (Count V of the Amended Complaint); Aerotek's and TEKsystems's claim that Mr. Ferrello misappropriated trade secrets (Count VI of the Amended Complaint); and TEKsystems's claim that Mr. Hadley and Ms. Rodrigues misappropriated trade secrets (Count VI of the Amended Complaint).   The Court will also grant Plaintiffs' Cross-Motion for Partial Summary Judgment with respect to whether Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements (Count II of the Amended Complaint and Count I of the Amended Counterclaim).

### 1. Breach of Employment Agreement by Messrs. Jordan, Curran, and Hadley (Count I of the Amended Complaint)[4]

"To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." Taylor v. NationsBank, N.A., 776 A.2d 645, 651 (Md. 2001). Thus, if the restrictive covenants in Mr. Jordan's, Mr. Curran's, and Mr. Hadley's employment agreements are unenforceable, and the Court cannot modify them to make them enforceable,[5] Plaintiffs' claim would fail as a matter of law. The Court concludes, however, after excising the employee non-solicitation provision, the restrictive covenant in Mr. Jordan's employment agreement is enforceable. Also, as the Court will discuss in further detail below, because Defendants challenge the non-competition provision of Mr. Curran's and Mr. Hadley's employment agreements on grounds that are inconsistent with the plain language of the provisions, the Court will not evaluate

---

[4] It is undisputed that Messrs. Jordan, Curran, and Hadley's employment agreements all contain a choice of law clause designating Maryland as the applicable law. (See Mr. Jordan's Employment Agreement at 5; Defs.' Mot. Partial Summ. J. Ex. 4, at 9, 49, 59). Therefore, the Court will apply Maryland law when evaluating the restrictive covenants in these agreements.

[5] "Maryland law does permit courts to 'blue pencil,' or excise language from restrictive covenants that is unnecessarily broad." Deutsche Post Global Mail, Ltd. v. Conrad, 292 F.Supp.2d 748, 754 (D.Md. 2003), aff'd on other grounds, 116 F.App'x 435 (4th Cir. 2004).

whether those provisions are enforceable. Accordingly, the Court will deny Defendants' Motion.

Under Maryland law, whether a restrictive covenant is enforceable depends upon the unique language of the covenant at issue, Holloway v. Faw, Casson & Co., 572 A.2d 510, 515 (Md. 1990), and the specific facts of the case, Ruhl v. F.A. Bartlett Tree Expert Co., 225 A.2d 288, 291 (Md. 1967). Specifically, a restrictive covenant must satisfy the following four requirements in order to be enforceable: "(1) the employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." Deutsche Post Global Mail, Ltd. v. Conrad, 116 F.App'x 435, 438 (4th Cir. 2004) (citing Silver v. Goldberger, 188 A.2d 155, 158 (Md. 1963)).

### a.  Mr. Jordan

Defendants challenge the non-competition, client non-solicitation, and employee non-solicitation provisions in Mr. Jordan's employment agreement. (See Defs.' Mot. Partial Summ. J. at 9-11). Specifically, they argue these provisions are wider in scope than is reasonably necessary to protect Aerotek's business. (Id.). Also, they argue the non-competition provision imposes an undue hardship on Mr. Jordan and violates

public policy.   (Id. at 10).   The Court will address these provisions in turn.

### i.   Non-competition Provision

### a.   Scope

The scope of the non-competition provision is not wider than is reasonably necessary to protect Aerotek's business or goodwill.   Defendants argue the provision's scope is unenforceable because it applies across the United States and Canada and extends to any aspect of "AEROTEK's Business." (Defs.' Mot. Partial Summ. J. at 10).   The Court disagrees. Because Aerotek competes for business on a national and international level, the provision's prohibition of competition throughout the United States and Canada is reasonable.   Also, the plain language of the provision only prevents Mr. Jordan from competing with those aspects of "AEROTEK's Business" for which he performed worked during the two years preceding his termination.

When a company competes for business on a national and international level, "a restrictive covenant limited to a narrow geographic area would render the restriction meaningless." Intelus Corp. v. Barton, 7 F.Supp.2d 635, 642 (D.Md. 1998).   In Hekimian Labs., Inc. v. Domain Sys., Inc., 664 F.Supp. 493 (S.D.Fla. 1987) and Intelus Corp. v. Barton, 7 F.Supp.2d 635 (D.Md. 1998), the district courts found the complete absence of

16

a geographic limitation in a non-competition provision to be reasonably necessary for the protection of the employer where the employer competed for business on a national and international level.   Aerotek performs staffing services "throughout the United States . . . ."   (Hilger Aff. ¶¶ 2, 3, ECF No. 75-3).   When Jordan was employed at Aerotek he led "<u>national</u> and <u>global</u>" sales efforts.   (<u>See</u> Pls.' Opp'n Ex. 3 ["ZP Company Overview"], at 2, ECF Nos. 75-5, 76-1) (emphasis added).   Thus, the provision's prohibition of competition throughout the United States and Canada is not wider in scope than is reasonably necessary to protect Aerotek's business or goodwill.

Moreover, the phrase "in which EMPLOYEE performed work" limits the provision's scope to only those businesses that Mr. Jordan supported.   Contrary to Defendants' assertion, the plain language of this provision does not prohibit Mr. Jordan from competing with any aspect of "AEROTEK's Business."

"Construction of a contract is, in the first instance, a question of law for the court to resolve." <u>Shapiro v. Massengill</u>, 661 A.2d 202, 208 (Md.Ct.Spec.App. 1995) (citing <u>Suburban Hosp. v. Dwiggins</u>, 596 A.2d 1069, 1075 (Md. 1991)). Maryland follows the objective law of contracts. <u>Gen. Motors Acceptance Corp. v. Daniels</u>, 492 A.2d 1306, 1310 (Md. 1985). Consequently, where the language of the non-competition

provision is plain and unambiguous, the Court will presume the parties meant what they expressed. See id. A written contract is unambiguous if, when read by a reasonably prudent person, it is not susceptible to more than one meaning. See Calomiris v. Woods, 727 A.2d 358, 363 (Md. 1999) (citing Heat & Power Corp. v. Air Prods. & Chems., Inc., 578 A.2d 1202, 1208 (Md. 1990)).

The provision prohibits Mr. Jordan from competing with "any aspect of AEROTEK's Business in which EMPLOYEE performed work during the two (2) year period preceding his/her termination of employment . . . ." (Mr. Jordan's Employment Agreement at 3). Mr. Jordan's employment agreement lists a number of "highly competitive businesses" in which Aerotek, TEKsystems, and Mentor 4, Inc. ("Mentor 4") engage and defines these businesses as "AEROTEK's Business." (Id. at 2). Some of these "highly competitive businesses," like providing staffing services for IT positions, are businesses that Mr. Jordan did not support while working for Aerotek. Therefore, Defendants argument that the provision is unenforceable because it prevents Mr. Jordan from competing with any aspect of "AEROTEK's Business" is without merit.

### b.   Undue Hardship and Public Policy

The provision does not impose an undue hardship on Mr. Jordan or violate public policy. A non-competition provision does not impose undue hardship when an employee is permitted to

undertake similar work.  _Intelus_, 7 F.Supp.2d at 642.  Here, the provision permits Mr. Jordan to employ his skills and talents as a salesman and corporate leader in a similar or related industry as long as he does not compete with any aspect of "AEROTEK's Business" that he supported during the two years preceding his termination.

This Court has noted that "the public has an interest in the enforcement of reasonable restrictive covenants."  _Id._  "As long as employers do not restrict employees from earning a living and do not limit fair competition, they must be given the opportunity to provide a service to their customers without risking a substantial loss of business and good will every time an employee decides to switch employment."  _Id._

This provision neither restricts Mr. Jordan's ability to earn a living nor limits fair competition.  The plain and unambiguous language of the provision permits Mr. Jordan to compete with any "AEROTEK[] Business" that he did not support while employed with Aerotek.  It would be unfair to permit Mr. Jordan to utilize his client contacts to compete with those aspects of "AEROTEK's Business" that he supported because the success of a staffing company "depends overwhelmingly upon the ability of its employees to make and maintain personal connections with clients."  _TEKsystems, Inc. v. Bolton_, No. RDB-

08-3099, 2010 WL 447782, at *6 (D.Md. Feb. 4, 2010).   Thus, the
provision only limits unfair competition.

### ii.  Client Non-solicitation Provision

The client non-solicitation provision has two subsections.
Subsection (a) prohibits Mr. Jordan from soliciting clients for
the purposes of entering into a business relationship if that
business relationship would be competitive with any aspect of
"AEROTEK's Business" for which Mr. Jordan performed worked
during his final two years with Aerotek.  (See Mr. Jordan's
Employment Agreement at 3).   Subsection (b) prohibits Mr. Jordan
from soliciting clients in attempt to reduce or eliminate the
business such clients conduct with Aerotek.  (Id. at 4).   Both
subsections only apply to Aerotek's customers.  (Id. at 3).   The
Court concludes this provision is enforceable.

The provision's scope is not wider than is reasonably
necessary to protect Aerotek's business or goodwill.   Defendants
contend the provision's scope is unenforceable because it
"prevents [Mr. Jordan] from having contact with any Aerotek
clients . . . regardless of whether he worked with [them] during
his time at Aerotek."   (Defs.' Mot. Partial Summ. J. at 11)
(emphasis in the original).   The Court disagrees.

First, the plain language of subsection (a) does not
prohibit Mr. Jordan from soliciting all of Aerotek's clients.
To the contrary, Mr. Jordan is only prohibited from soliciting

Aerotek's clients with which a business relationship would be competitive with any aspect of "AEROTEK's Business" that he supported during his final two years with Aerotek.   (Mr. Jordan's Employment Agreement at 3).

Furthermore, a non-solicitation provision is enforceable when it is narrowly tailored to the work that an employee performed before termination.  Gill v. Computer Equip. Corp., 292 A.2d 54, 59 (Md. 1972); see also TEKsystems, Inc. v. Lajiness, No. 12 C 10155, 2013 WL 3389062, at *3-*5 (N.D.Ill. July 8, 2013) (applying Maryland law and finding a restrictive covenant was not facially overbroad where the employee was prohibited from engaging in any aspect of the employer's business for which the employee performed services during the two years preceding termination).  In Gill, the Court of Appeals of Maryland upheld a restrictive covenant prohibiting a former employee from servicing all customers of the particular division in which he worked.  See 292 A.2d at 59.  The court emphasized the provision applied only to the "narrow area in which Gill was employed."  Id.  Here, subsection (a) is also tailored to the narrow area in which Mr. Jordan was employed because it only applies to business relationships that would be competitive with the specific aspects of "AEROTEK's Business" that he supported. Therefore, subsection (a)'s scope is reasonable and enforceable.

Subsection (b) does not have the same narrowing language as subsection (a). It prohibits Mr. Jordan from soliciting any Aerotek client that was a client during his final two years with Aerotek. (See Mr. Jordan's Employment Agreement at 3). Courts applying Maryland law have both enforced and struck down restrictive covenants that prohibit a former employee from soliciting all of the former employer's clients. See Tuttle v. Riggs-Warfield-Roloson, Inc., 246 A.2d 588, 589 (Md. 1968) (enforcing); Conrad, 292 F.Supp.2d at 756 (striking down); Holloway, 552 A.2d at 1319-21 (striking down). In evaluating whether subsection (b) is enforceable, the Court must consider the unique facts and circumstances of this case. See Ruhl, 225 A.2d at 291.

In Holloway, the Court of Specials Appeals of Maryland struck down a provision prohibiting solicitation of all clients because it was "highly unlikely" the former employee could profit from his client relationships to solicit clients of other offices with whom he had no contact. 552 A.2d at 1319. Here, however, it is much more likely that Mr. Jordan could take advantage of his client relationships to solicit clients with whom he did not work while at Aerotek. Mr. Jordan won exclusive contracts with large government prime contractors like Northrop Grumman and Lockheed Martin. (ZP Company Overview at 2). Mr. Jordan could use his relationships with key contacts at these

22

prime contractors to encourage their subcontractors to divert their business from Aerotek.  As a result, subsection (b)'s scope is reasonable and enforceable.

### iii. Employee Non-solicitation Provision

Like the client non-solicitation provision, this provision also has two subsections.  Subsection (a) prohibits Mr. Jordan from soliciting current employees to provide services competitive with Aerotek and subsection (b) prohibits Mr. Jordan from soliciting current employees to resign from Aerotek.  (Mr. Jordan's Employment Agreement at 4).  This provision applies to "the Aerotek" which the agreement defines as Aerotek and its related companies, TEKsystems and Mentor 4.  (Id. at 3).  The Court concludes this provision is unenforceable because it is wider in scope than is reasonably necessary to protect Aerotek's interest.

In order to be enforceable, restrictive covenants must be specifically targeted at preventing former employees from trading on the goodwill they generated during their former employment.  See Conrad, 116 F.App'x at 439; MCS Services, Inc. v. Jones, No. WMN-10-1042, 2010 WL 3895380, at *3 (D.Md. Oct. 1, 2010).  There is evidence from which a reasonable jury could infer Mr. Jordan generated goodwill with Aerotek employees because he supervised hundreds of Aerotek sales employees while holding various executive positions.  (See Jordan Aff. ¶¶ 16,

17, 18, ECF No. 75-4).   There is no evidence, however, that Mr. Jordan generated goodwill with TEKsystems or Mentor 4 employees. Mr. Jordan did not work for TEKsystems or Mentor 4. Furthermore, there is no evidence that he regularly interacted with TEKsystems or Mentor 4 employees at training sessions, conferences, or other meetings.   Therefore, by prohibiting Mr. Jordan from soliciting TEKsystems and Mentor 4 employees, this provision is not specifically targeted at preventing Mr. Jordan from trading on his goodwill with other employees.   Accordingly, the Court concludes this provision is unenforceable because its scope is unnecessarily broad.

When the language of a restrictive covenant is unnecessarily broad, however, "'blue pencil' excision of offending contractual language without supplementation or rearrangement of any language is entirely in accord with Maryland law."   Fowler v. Printers II, Inc., 598 A.2d 794, 802 (Md.Ct.Spec.App. 1991); accord Conrad, 292 F.Supp.2d at 757-58 ("[B]lue penciling must be limited to the removal of offending language and cannot include the addition of words or phrases in an effort to make the restrictive covenant reasonable.").   Because the employee non-solicitation provision is overly broad, the Court will use the blue pencil rule to excise that provision from the rest of the restrictive covenant in Mr. Jordan's employment agreement.

24

### b.  Messrs. Curran and Hadley

In addition to challenging the non-competition provision and two non-solicitation provisions in Mr. Jordan's employment agreement, Defendants also challenge the non-competition provisions in Mr. Curran's and Mr. Hadley's employment agreements.  They do so, however, based on their interpretation that the "Complaint <u>implies</u> that Aerotek <u>may</u> attempt to enforce a nationwide non-competition agreement against Messrs. Curran and Hadley."  (Defs.' Mot. Partial Summ. J. at 11) (emphasis added).  Specifically, Defendants argue "[t]o the extent Aerotek construes the [non-competition provision in their employment agreements] as prohibiting Messrs. Hadley and Curran from working in the staffing industry anywhere in the United States, such a provision is overly broad and not narrowly tailored to protect any legitimate business interest."  (<u>Id.</u>).

There are two issues with Defendants' argument.  First, Plaintiffs dispute that they intend to enforce the non-competition provisions on a nationwide basis because that is incongruent with the language of the provisions.  (<u>See</u> Pls.' Opp'n at 36).  Second, the plain and unambiguous language of the provisions demonstrates that they do not apply "anywhere in the United States."  To the contrary, they only apply within a

radius of 100 miles[6] from any office at which Messrs. Curran and Hadley worked during their final two years with Aerotek. (Defs.' Mot. Partial Summ. J. Ex. 4, at 4, 55).  Therefore, the Court will not address whether these provisions are enforceable.

Based on the foregoing analysis, the Court concludes that after excising the employee non-solicitation provision, the restrictive covenant in Mr. Jordan's employment agreement is enforceable as a matter of law.  Accordingly, the Court will deny Defendant's Motion for Partial Summary Judgment with respect to Count I of the Amended Complaint.

## 2. Breach of IIP Award Agreements by Messrs. Jordan, Curran, Hadley, and Nicholas (Count II of the Amended Complaint and Count I of the Amended Counterclaim)[7]

The Court concludes Sections 9(3) and 9(5) of the IIP are enforceable as a matter of law because their scope is no wider than is reasonably necessary to protect the goodwill of Allegis and its subsidiaries.  There is no genuine dispute that before his IIP obligations expired, Mr. Jordan solicited Mr. Hadley to resign from Aerotek.  Also, there is no genuine dispute that

---

[6] If Defendants had challenged the geographic scope of 100 miles, the Court would conclude it is reasonable and enforceable based on the same reasoning the Court outlined above with respect to the geographic scope of the non-competition provision in Mr. Jordan's employment agreement.

[7] It is undisputed that the IIP contains a choice of law clause designating Maryland as the applicable law.  (See IIP at 11).  Therefore, the Court will apply Maryland law when evaluating whether Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements.

before their IIP obligations expired, Messrs. Curran, Hadley, and Nicholas staffed IT positions in competition with TEKsystems. Accordingly, the Court concludes Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements, and the Court will grant Plaintiffs' Cross-Motion for Partial Summary Judgment.

Plaintiffs argue Mr. Jordan breached IIP Sections 9(3) and 9(5), (Pls.' Opp'n at 14-18), and Messrs. Curran, Hadley, and Nicholas breached Section 9(5), (id. at 18-21). Defendants argue Sections 9(3) and 9(5) are unenforceable because they do not protect legitimate business interests and they are unreasonably broad in scope. (See Defs.' Opp'n Pls.' Cross-Mot. Partial Summ. J. & Reply Pls.' Opp'n Defs.' Mot. Partial Summ. J. ["Defs.' Opp'n"] at 11-14, ECF No. 77).

Defendants further argue even if the Court finds section 9(3) is enforceable, there is a genuine dispute as to whether Mr. Jordan, before his IIP obligations expired, solicited Messrs. Curran and Hadley to leave Aerotek. (Id. at 14). Defendants contend the evidence demonstrates nothing more than "a handful of 30,000-foot conversations between close personal friends, which occurred right at the expiration of the 30-month non-solicitation period." (Id.). Defendants do not, however, dispute that before their IIP obligations expired, Messrs. Curran, Hadley, and Nicholas staffed IT positions in competition

with TEKsystems.   (See Defs.' Answer Pls.' Am. Compl. ¶ 60, ECF No. 30) ("Defendants admit that Messrs. Curran, Nicholas, Ferrello and Hadley and Ms. Rodrigues have worked on positions that are, to the best of their knowledge, positions that TEKsystems would staff.").

Because Defendants attack the enforceability of Section 9(3) and 9(5) on the same grounds, after discussing the standard for evaluating these provisions, the Court will evaluate them together.

### a.   Standard for Evaluating Sections 9(3) and 9(5)

Defendants argue the Court should evaluate Sections 9(3) and 9(5) using the reasonableness standard for restrictive covenants in employment agreements.   (Defs.' Opp'n at 9). Plaintiffs disagree[8] and argue all the cases Defendants cite to support their argument are inapposite because they deal with liquidated damages clauses, forfeiture clauses, and pension plans.   (Id. at 6).   Plaintiffs also argue the IIP is not a typical employment contract because "this Court has already found compliance with the provisions of section 9 is a condition prerequisite to entitlement to the IIP payments."   (Id. at 5);

---

[8]   Plaintiffs do not, however, proffer an alternative standard.   Instead, they argue "the IIP is reasonable even if interpreted as an employment-context restrictive covenant." (Pls.' Reply Supp. Cross-Mot. Partial Summ. J. ["Pls.' Reply"] at 10, ECF No. 81).

see Allegis Grp., Inc. v. Jordan, GLR-12-2535, 2013 WL 1701125, at *14 (D.Md. Apr. 17, 2013).

While only persuasive authority, Capital One Financial Corp. v. Kanas, 871 F.Supp.2d 520 (E.D.Va. 2012), is instructive in determining what standard to apply in this case.  In Capital One, the U.S. District Court for the Eastern District of Virginia concluded it was more appropriate to apply a stricter employer/employee standard[9] than a more liberal sale-of-business standard when evaluating the enforceability of restrictive covenants in a separation agreement.  The court reached this conclusion because the agreements became effective upon termination of employment and their plain language indicated they were attributable to the employer/employee relationship. See Capital One, 871 F.Supp.2d at 529.

Here, the IIP shares several characteristics with the separation agreements in Capital One.  While Units are allocated to an IIP participant's account during the course of her

_____

[9]  The employer/employee standard under Virginia law is nearly identical to the employment-contract standard under Maryland law.  Under Virginia law, a restrictive covenant in an employment contract is reasonable if it is: "(1) narrowly drawn to protect the employer's legitimate business interest, (2) not unduly burdensome on the employee's ability to earn a livelihood, and (3) consistent with public policy."  Capital One, 871 F.Supp.2d at 530 (citing Modern Env'ts, Inc. v. Stinnett, 561 S.E.2d 694, 695 (Va. 2002)).  The analysis of these factors "requires consideration of the restriction in terms of function, geographic scope, and duration."  Id. (quoting Simmons v. Miller, 544 S.E.2d 666, 677 (Va. 2001)) (internal quotation marks omitted).

employment, the participant does not become entitled to receive payments for those units until the participant's "Separation from Service." (IIP at 6, 7). Furthermore, the plain language of the IIP indicates it is attributable to the employer/employee relationship between Allegis and the participant. The terms "Employee" and "Companies" are used throughout the IIP. Therefore, the Court concludes it is appropriate to apply the standard for employment contracts: "(1) [T]he employer must have a legally protected interest, (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest, (3) the covenant cannot impose an undue hardship on the employee, and (4) the covenant cannot violate public policy." Conrad, 116 F.App'x at 438 (citing Silver v. Goldberger, 188 A.2d 155, 158 (Md. 1963)).

### b.   Enforceability of Sections 9(3) and 9(5)

#### i.   Legally Protected Interest of Aerotek and other Allegis Subsidiaries

Aerotek has a legally protected interest in preventing the activities proscribed by Sections 9(3) and 9(5) of the IIP. As Messrs. Jordan, Curran, Hadley, and Nicholas ascended through the ranks at Aerotek, they engaged in and supervised sales activities, which gave them an opportunity to form strong relationships with clients. See Intelus, 7 F.Supp.2d at 639 ("[E]mployers have a [sic] interest in preventing an employee

from using his contacts with clients to recruit those clients after his employment has ended."); see also Conrad, 116 F.App'x at 438 ("[R]estrictive covenants almost always serve a legitimate employer interest when they restrict former salespersons . . . ." (citing Silver, 188 A.2d at 158)). Furthermore, Messrs. Jordan, Curran, Hadley, and Nicholas all held executive-level positions before leaving Aerotek. Consequently, to the extent these positions required supervising and promoting other Aerotek employees, Messrs. Jordan, Curran, Hadley and Nicholas could have significant influence over those employees. Even if they did not directly supervise other Aerotek employees, their former positions of authority could nonetheless permit them to exert influence over their former colleagues, particularly those who held more junior positions.

Allegis and its subsidiaries other than Aerotek also have a legally protected interest in the restrictions that Section 9(3) and 9(5) impose. Although Messrs. Jordan, Curran, Hadley and Nicholas only worked for Aerotek, all Allegis subsidiaries contribute to the value of IIP payments. The value of IIP payments is determined, in part, by the value of Allegis's common stock, (see IIP at 5), and the financial performance of all Allegis subsidiaries affects the value of that stock. Moreover, as the Court will discuss in greater detail below, the

purpose of the IIP is to promote the long term economic growth
of Allegis and all its subsidiaries.

Allowing Messrs. Jordan, Curran, Hadley, and Nicholas to
solicit and divert employees, clients, and business from Aerotek
and its subsidiaries would violate the purpose of the IIP and
harm the very companies that contribute to IIP payments.
Therefore, Allegis and its subsidiaries have a legally protected
interest in preventing these activities.

### ii.  Scope

Sections 9(3) and 9(5) are not wider, as to scope, than is
reasonably necessary to protect the business or goodwill of
Allegis and its subsidiaries.   Defendants argue the scope of
these provisions is unreasonably broad because they protect
Allegis subsidiaries for which a former employee did not work.
Specifically, Defendants contend that because Messrs. Jordan,
Curran, Hadley, and Nicholas never worked for TEKsystems, it is
unreasonable to prohibit them from soliciting clients, business,
or employees in competition with TEKsystems. (See Defs.' Opp'n
at 12-14). The Court disagrees.

In order to be enforceable, restrictive covenants must be
specifically targeted at preventing former employees from
trading on the goodwill they generated during their former
employment.   See Conrad, 116 F.App'x at 439; Jones, 2010 WL
3895380, at *3.  By protecting all Allegis subsidiaries, Section

9(5) is specifically targeted at preventing Messrs. Jordan, Curran, Hadley, and Nicholas from staffing positions in competition with Allegis subsidiaries other than Aerotek by trading on their goodwill with the large customers they supported while working for Aerotek.

Messrs. Jordan, Curran, and Hadley worked with large government agencies like the Department of Energy, the Army Corps of Engineers, and the Department of the Navy, as well as large government prime contractors like Lockheed Martin, Northrop Grumman, SAIC, and Raytheon. (ZP Company Overview at 2; Curran Aff. ¶ 7, ECF No. 75-23; Hadley Aff. ¶ 10, ECF No. 75-24). Mr. Nicholas worked with large commercial companies in the private sector. (Nicholas Aff. ¶ 8, ECF No. 75-33). These large customers have a wide diversity of staffing requirements across many departments. Consequently, two staffing companies that specialize in filling positions in different skill areas could have the same clients. In fact, Andy Hilger, a Vice President in Allegis's Office of Strategic Management, admits that although they are "separate business entities, Aerotek and TEKsystems share numerous clients." (Hilger Aff. ¶ 5).

After resigning from one of Allegis's subsidiaries, a former employee could exploit her goodwill with a large customer to staff positions with that same customer in competition with one of the Allegis subsidiaries for which the employee did not

work.  For example, an Aerotek recruiter could staff a hardware engineering position at Northrop Grumman and then, after resigning from Aerotek, use the employee's contacts at Northrop Grumman to staff an IT-support position in competition with TEKsystems.

Mr. Jordan's activities at ZP demonstrate the potential to exploit goodwill with the same customer to staff positions targeted by different Allegis subsidiaries.  For example, while working for Aerotek, Mr. Jordan won an exclusive contract with Lockheed Martin.  (ZP Company Overview at 2).  Lockheed Martin was one of ZP's first customers and Mr. Jordan, while working for ZP, staffed an IT position with Lockheed Martin for "T4 Graphics Support."  (Pls.' Opp'n Ex. 20, at 1-2, 4-6, 8, 11, 13, 15, ECF Nos. 75-22, 76-3).

Because Messrs. Jordan, Curran, Hadley, and Nicholas all have the potential to trade on their goodwill with large customers to take business away from not only Aerotek, but also other Allegis subsidiaries, Section 9(5)'s scope is not wider than is reasonably necessary to protect the business or goodwill of Allegis and its subsidiaries.

There is no evidence that Messrs. Jordan, Curran, Hadley, and Nicholas generated goodwill with employees of other Allegis subsidiaries.  Therefore, by prohibiting them from soliciting employees of any Allegis subsidiary, Section 9(3) is not

specifically targeted at preventing them from trading on their goodwill. Nevertheless, Section 9(3)'s scope is reasonable because the purpose of the IIP is to promote the long term economic growth of Allegis and its subsidiaries.

Aerotek and TEKsystems laterally promote and transfer their executives. (Hilger Aff. ¶ 6). For example, in recent years, a TEKsystems salesperson was promoted to Director of Business Operations ("DBO") for Aerotek, a TEKsystems DBO became an Aerotek DBO, and a TEKsystems Vice President of Government Services transferred to Aerotek to perform the same role. (Id.). These executives could leverage their rapport with employees at the subsidiary from which they transferred to recruit those employees after leaving Allegis. Messrs. Jordan, Curran, Hadley, and Nicholas, however, never worked for another Allegis subsidiary. Furthermore, while Aerotek and TEKsystems conduct joint training, (see id.), there is no evidence that Messrs. Jordan, Curran, Hadley, and Nicholas had any substantial interaction with employees of TEKsystems or any other Allegis subsidiary. Consequently, because Messrs. Jordan, Curran, Hadley, and Nicholas never generated goodwill with employees of other subsidiaries, by protecting all Allegis subsidiaries, Section 9(3) is not targeted at preventing these former employees from trading on their goodwill.

Although Section 9(3) is not specifically targeted at preventing Messrs. Jordan, Curran, Hadley, and Nicholas from trading on their goodwill, permitting them to solicit current employees of Allegis and its subsidiaries would be completely inconsistent with the purpose of the IIP. The purpose of the IIP is to provide IIP participants "an incentive to promote the best interests of the Companies, and in particular, an incentive to promote the long term economic growth of the Companies." (IIP at 2). The IIP defines "Companies" as Allegis and any of its subsidiaries. (Id.). Allowing Messrs. Jordan, Curran, Hadley, and Nicholas to solicit top-performing current employees of Allegis and its subsidiaries would undermine the long term economic growth of these companies. Consequently, because Section 9(3) must protect Allegis and all its subsidiaries in order to fulfill the purpose of the IIP, Section 9(3)'s scope is not wider than is reasonably necessary to protect the business or goodwill of Allegis and its subsidiaries.

### c.   Breach of Sections 9(3) and 9(5)

There is no genuine dispute that before his IIP obligations expired, Mr. Jordan solicited Mr. Hadley to resign from Aerotek. Likewise, there is no genuine dispute that before their IIP obligations expired, Messrs. Curran, Hadley, and Nicholas staffed IT positions in competition with TEKsystems. Accordingly, the Court concludes Messrs. Jordan, Curran, Hadley,

36

and Nicholas breached their IIP Award Agreements by violating Section 9 of the IIP.

### i.  Mr. Jordan

There is no genuine dispute that before his IIP obligations expired on August 21, 2011, Mr. Jordan sent Mr. Hadley a proposal to work for him.  Therefore, the Court concludes Mr. Jordan breached his IIP Award Agreement by violating Section 9(3) of the IIP.

On August 19, 2011, Mr. Hadley sent Mr. Curran an email where he referred to "Justin," "company," "ownership," and "initial comp idea."  (Pls.' Opp'n Ex. 28, at 2, ECF No. 75-30). Mr. Hadley admits that by "Justin" he was referring to Mr. Justin Jordan; by "company," he was referring to Mr. Jordan's company; by "ownership," he was referring to ownership in Mr. Jordan's company; and by "initial comp idea," he was referring to a "proposal or plan or idea of potential compensation related to working for [Mr.] Jordan." (Id. Ex. 27 at 9, ECF No. 75-29). Likewise, in his Answers to Plaintiffs' Second Set of Interrogatories, Mr. Hadley states that "to the best of his recollection, the 'initial comp idea' references Mr. Jordan's compensation proposal to [him]."  (Id. Ex. 29, at 12, ECF No. 75-31).

Mr. Jordan admits that he first contacted Messrs. Curran and Hadley, for the purposes of employment with ZP or PES, in

the summer of 2011.  (Id. Ex. 25, at 8, ECF No. 75-27).  Because "summer 2011" could correspond to a date after August 21, the inference most favorable to Defendants is that Mr. Jordan did not contact Messrs. Curran and Hadley before August 21, 2011. Mr. Jordan further admits that he "had general conversations with [Mr.] Curran about potentially working together prior to August 20, 2011."  (Id. at 9).  Because these conversations could have occurred before Mr. Jordan left Aerotek, the inference most favorable to Defendants is that these conversations did not occur after Mr. Jordan left Aerotek and was subject to Section 9 of the IIP.

Mr. Jordan does not, however, deny that he sent an employment proposal to Mr. Hadley before August 21, 2011. Moreover, Defendants present no evidence to dispute Mr. Hadley's admission that Mr. Jordan sent him an employment proposal before August 21, 2011.  Therefore, there is no genuine dispute that before his IIP obligations expired, Mr. Jordan solicited Mr. Hadley to leave the employ of Aerotek.

### ii. Messrs. Curran, Hadley, and Nicholas

Before their IIP obligations expired, Messrs. Curran, Hadley, and Nicholas all took business away from TEKsystems. Therefore, as a matter of law, the Court concludes they breached their IIP Award Agreements by violating Section 9(5) of the IIP.

In his affidavit, TEKsystems Regional Vice President, Richard Waag, testifies that Lockheed Martin was a TEKsystems client prior to 2011 and the following businesses were TEKsystems clients prior to 2012: Atlantic Business Technologies; Peak 10; Fresenius; SciMed, Inc.; Freudenberg IT; Iron Data; Verisk Health Partners; XS, Inc.; Burt's Bees; INC Research; Rail, Inc.; Red Hat; RegEd; SAS Institute, Inc.; Century Link; Citrix; and Salix Pharmaceuticals. (Waag Aff. ¶¶ 5, 7, ECF No. 75-18). Mr. Waag further testifies that because TEKsystems does not have exclusivity agreements with most of its clients, multiple staffing companies satisfy the needs of these clients. (Id. ¶ 8). Therefore, to the extent a competitor is able to satisfy an IT staffing requirement for one of TEKsystems's clients, that competitor takes business away from TEKsystems. (Id.). Defendants present no evidence to dispute these facts.

Mr. Curran admits that before his IIP obligations expired, he provided IT staffing services to TEKsystems client Lockheed Martin. (Pls.' Opp'n Ex. 63, at 4, ECF No. 75-65). Mr. Nicholas admits that before his IIP obligations expired, he provided IT staffing services to TEKsystems clients Lockheed Martin, Century Link, Citrix, and Salix Pharmaceuticals. (Id. Ex. 37, at 4, ECF No. 75-39). Mr. Hadley admits that before his IIP obligations expired, he provided IT staffing services to

TEKsystems clients Peak 10, Atlantic Business Technologies, and Sci Med Solutions. (Id. Ex. 29, at 5, ECF No. 75-31). Defendants present no evidence to dispute these admissions.

Additionally, Plaintiffs produce a series of emails between Mr. Hadley, Mr. Jordan, and a prospective PES client. In an email to the prospective client, Mr. Hadley "strongly advise[d] [them] against signing an exclusivity agreement with Tek[systems] or any company for that matter." (Id. Ex. 39, at 1, ECF No. 75-41). Mr. Hadley then forwarded this email to Mr. Jordan and stated: "Tek[systems] has placed 6 people in the last 6 months. They have the lock down on this place . . . until NOW." (Id.). Mr. Jordan then responded: "I love it. Lets (sic) take them DOWN!" (Id.). This is an example of an aggressive attempt to solicit and divert business from TEKsystems.[10] Defendants present no evidence to dispute that Mr. Hadley sent these emails.

Based on the foregoing analysis, the Court concludes Sections 9(3) and 9(5) of the IIP are enforceable as a matter of law. The Court further concludes Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements by violating Section 9 of the IIP. Accordingly, the Court will

---

[10] Plaintiffs present evidence that Mr. Jordan even planned to reimburse Mr. Hadley for his loss of IIP payments. (See id. Ex. 40, at 1, ECF No. 75-42).

grant Plaintiffs' Motion for Partial Summary Judgment with
respect to Count II of the Amended Complaint and Count I of the
Amended Counterclaim.

### 3. Breach of Duty of Loyalty by Mr. Ferrello (Count V of the Amended Complaint)

The Court will grant Defendants' Motion with respect to
Plaintiffs' claim that Mr. Ferrello breached his duty of loyalty
to Aerotek because Plaintiffs proffer no evidence that Mr.
Ferrello engaged in any conduct that would defeat the privilege
to prepare or make arrangements to compete with Aerotek.

Plaintiffs contend Mr. Ferrello breached his duty of
loyalty to Aerotek because he failed to disclose Mr. Jordan's
plan to hire-away Aerotek's top-performing account managers
(Pls.' Opp'n at 26). Defendants argue failing to disclose plans
for competition without perpetrating misconduct inimical to the
employer does not constitute a breach of the duty of loyalty.
(Defs.' Mot. Partial Summ. J. at 15). The Court agrees with
Defendants.

The duty of loyalty is an implied duty that is "read into
every contract of employment," and requires that an "employee
act solely for the benefit of his employer in all matters within
the scope of employment, avoiding all conflicts between his duty
to the employer and his own self-interest." Md. Metals, Inc. v.
Metzner, 382 A.2d 564, 568 (Md. 1978) (citing C-E-I-R, Inc. v.

41

Computer Dynamics Corp., 183 A.2d 374, 379 (Md. 1962)).  When determining whether an employee has breached the duty of loyalty, a court must thoroughly examine the facts and circumstances of the case.  See Weichert Co. of Md. v. Faust, 19 A.3d 393, 401 (Md. 2011) (citing Md. Metals, 382 A.2d at 570).

The Court of Appeals of Maryland recognizes a "privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty."  Md. Metals, 382 A.2d at 569 (citing Operations Research, Inc. v. Davidson & Talbird, Inc., 217 A.2d 375, 388 (Md. 1966)).  This privilege is, however, not absolute.  Id.  Exercise of the privilege will constitute a breach of the duty of loyalty where an employee commits a fraudulent, unfair, or wrongful act in the course of preparing to compete.  Id.  Specific examples of misconduct which will defeat the privilege include misappropriation of trade secrets, misuse of confidential information, solicitation of an employer's customers prior to cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, and usurpation of an employer's business opportunity.  Id. at 569-70.  Furthermore, while an employee must be candid to his employer about his plans for competition, an employee "is not bound to reveal the precise

nature of his plans to the employer unless he has acted inimically to the employer's interest beyond the mere failure to disclose." Id. at 569 (emphasis added) (citing Cudahy Co. v. Am. Labs., Inc., 313 F.Supp. 1339, 1346 (D.Neb. 1970)).

Plaintiffs proffer no evidence that Mr. Ferrello engaged in any conduct that would defeat the privilege to prepare or make arrangements to compete with Aerotek. As the Court will discuss below, while Mr. Ferrello did set up an email address to exchange documents with Mr. Jordan, (see Pls.' Opp'n Ex. 45, ECF No. 75-47), there is no evidence from which a reasonable jury could conclude the documents in Defendants' collective possession contain trade secrets. Furthermore, Plaintiffs proffer no evidence that Mr. Ferrello solicited Aerotek's customers prior to his resignation, conspired to bring about mass resignation of Aerotek's key employees, or usurped any of Aerotek's business opportunities. Mr. Ferrello's deposition does demonstrate that he knew Mr. Jordan planned to hire-away Aerotek employees for his new companies. (See Ferrello Dep. 68:12-21, Oct. 17, 2013, ECF No. 75-46). Plaintiffs cite this testimony and argue Mr. Ferrello breached his duty of loyalty when he "remain[ed] silent" and "failed to report" Mr. Jordan's plan. There is no evidence, however, that Mr. Ferrello engaged in any inimical activity beyond this nondisclosure.

Accordingly, the Court will grant, as to Mr. Ferrello, Defendant's Motion for Partial Summary Judgment with respect to Count V of the Amended Complaint.

**4.  Misappropriation of Trade Secrets by Messrs. Ferrello and Hadley and Ms. Rodrigues (Count VI of the Amended Complaint)**

The Court will grant Defendants' Motion with respect to Aerotek's and TEKsystems's claim that Mr. Ferrello misappropriated trade secrets and TEKsystems's claim that Mr. Hadley and Ms. Rodrigues misappropriated trade secrets. Plaintiffs do not proffer evidence from which a reasonable jury could infer the documents Defendants allegedly misappropriated are trade secrets.

Under Maryland law, claims for misappropriation of trade secrets are governed by the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law §§ 11-1201 et seq. (West 2014).  The MUTSA defines a trade secret as follows:

> (e)  "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> > (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 11-1201 (e)(1)-(2).  The MUTSA specifies two actions that constitute misappropriation: (1) acquisition of a trade secret by improper means or (2) disclosure of a trade secret without express or implied consent.  See id. § 11-1201(c)(1)-(2).

Plaintiffs allege Defendants misappropriated five specific documents: (1) a TEKsystems CATS 2 Price Sheet; (2) a Federal Supply Service Price List; (3) a Software Market Definitions Memorandum; (4) an Allegis Group Internal Employee Handbook; and (5) a TEKsystems Staffing Services Agreement.  Defendants do not dispute their collective possession of these documents.  They argue, however, Plaintiffs have not proffered sufficient evidence to raise a genuine dispute as to whether these documents constitute trade secrets under the MUTSA.  (See Defs.' Opp'n at 20-21).  The Court agrees.[11]

Whether the five documents at issue qualify as trade secrets is a question of fact.  GTCO Corp. v. Kontron Elektronik GmbH, 829 F.2d 1119 (4th Cir. 1987) (unpublished table decision).  Plaintiffs, however, bear the "burden of producing some evidence that [the five documents] me[e]t the definition of a trade secret."  Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d

---

[11] Because the Court concludes there is no genuine dispute as to whether these documents constitute trade secrets, the Court will not address misappropriation.

655, 661 (4th Cir. 1993) (emphasis in the original).  Plaintiffs
have not met this burden.

        **a.   CATS 2 Price Sheet and Federal Supply Service**
        **     Price List**

Pricing information is protectable as a trade secret.
Optic Graphics, Inc. v. Agee, 591 A.2d 578, 586 (Md.Ct.Spec.App.
1991).  Information, however, cannot qualify as a trade secret
when it is published on the Internet.  See Hoechst Diafoil Co.
v. Nan Ya Plastics Corp., 174 F.3d 411, 419 (4th Cir. 1999)
(concluding the district court in Religious Tech. Ctr. v. Lerma,
908 F.Supp. 1362 (E.D.Va. 1995), correctly found that
information which had been published on the Internet lost its
trade secret status).  Both of these pricing documents have been
published on the Internet.  Compare TEKsystems, Inc. CATS 2
Price Sheet, Md. Dep't of Info. Tech.
http://doit.maryland.gov/contracts/Documents/catsII
_laborrates/TEKsystemsInc.pdf (last visited Apr. 9, 2014), with
(Pls.' Opp'n Ex. 51, ECF No. 75-53); compare Training Courses
for Information Technology Equipment and Software, Docstoc,
http://www.docstoc.com/docs/27502511/SIN-132-50---TRAINING-
COURSES-FOR-INFORMATION-TECHNOLOGY-EQUIPMENT-AND (last visited
Apr. 9, 2014), with (Pls.' Opp'n Ex. 56, ECF No. 75-58).  Thus,
the CATS 2 Price Sheet and the Federal Supply Service Price List
cannot qualify as trade secrets.

### b.   Software Market Definitions Memorandum

Plaintiffs proffer no evidence that the information in the Software Market Definitions Memorandum ("SMDM") is not generally known or would be valuable to competitors.  Marketing plans are protectable as trade secrets.  <u>Optic Graphics</u>, 591 A.2d at 586. Marketing plans cannot qualify as trade secrets, however, when they are based on information "readily available from the marketplace."  <u>Motor City Bagels, L.L.C. v. Am. Bagel Co.</u>, 50 F.Supp.2d 460, 478-79 (D.Md. 1999); <u>see</u> <u>Optic Graphics</u>, 591 A.2d at 587 (affirming the lower court's ruling that a marketing strategy was not a trade secret because the information "was readily available from the marketplace" and the defendants could obtain the same information simply by talking with prospective clients).  Also, in order to qualify as a trade secret, this document must be valuable to competitors.  <u>Padco Advisors, Inc. v. Omdahl</u>, 179 F.Supp.2d 600, 610 (D.Md. 2002) (citing <u>Home Paramount Pest Control Cos. V. FMC Corp./Agr. Prods. Grp.</u>, 107 F.Supp.2d 684, 693 (D.Md. 2000)).  The SMDM is not.

First, Defendants offer an unrebutted affidavit from Mr. Jordan where he opines that the information in Plaintiffs' Software Market Definitions Memorandum is "readily available from the marketplace" because it could be "engineered through Google searches on the two companies and the type of placements that they make." (Jordan Aff. ¶ 27, ECF No. 75-32).  Plaintiffs

argue Mr. Jordan's statement is not credible because it is self-serving.  (See Pls.' Opp'n at 44).  "The function of the judge at the summary judgment stage[, however,] is not to . . . weigh credibility but to determine whether there is any genuine issue of fact that can only properly be resolved by a finder of fact . . . ."  JKC Holding Co., 264 F.3d at 465 (citing Anderson, 477 U.S. at 250).  Plaintiffs proffer no evidence to raise a genuine dispute as to whether the information in this document is not generally known or readily available from the marketplace.

Furthermore, while Plaintiffs argue the information in this document would be valuable to competitors, (see Pls.' Opp'n at 28), they proffer no evidence to support this claim.  Thus, the claim is merely speculative.  As a result, as a matter of law, no reasonable jury could conclude the Software Market Definitions Memorandum is a trade secret.

### c. TEKsystems Staffing Services Agreement and Allegis Group Internal Employee Handbook

Finally, Plaintiffs offer no evidence that the information in the agreement and the handbook is not generally known or would be valuable to competitors.  Thus, there is no evidence from which a reasonable jury could conclude these documents are trade secrets.

Accordingly, the Court will grant Defendant's Motion with respect to Count VI of the Amended Complaint for Aerotek's and

TEKsystems's claim against Mr. Ferrello and TEKsystems's claim against Mr. Hadley and Ms. Rodrigues.

### III. CONCLUSION

For the foregoing reasons, the Court will, by separate Order, DENY Defendant's Motion for Partial Summary Judgment (ECF No. 74) with respect to Allegis's and Aerotek's claim that Messrs. Jordan, Curran, and Hadley breached their employment agreements (Count I of the Amended Complaint).  The Court will, however, GRANT the Motion with respect to the following: Aerotek's claim that Mr. Ferrello breached his duty of loyalty (Count V of the Amended Complaint); Aerotek's and TEKsystems's claim that Mr. Ferrello misappropriated trade secrets (Count VI of the Amended Complaint); and TEKsystems's claim that Mr. Hadley and Ms. Rodrigues misappropriated trade secrets (Count IV of the Amended Complaint).  The Court will also GRANT Plaintiffs' Cross-Motion for Partial Summary Judgment (ECF No. 75) with respect to whether Messrs. Jordan, Curran, Hadley, and Nicholas breached their IIP Award Agreements (Count II of the Amended Complaint and Count I of the Amended Counterclaim). Entered this 10th day of June, 2014

_____/s/_____
George L. Russell, III
United States District Judge
